# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3652-23
A-3653-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

K.W., and L.B.,[1]

      Defendants-Appellants,

and

S.M.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.X.W.,
K.R.W.-B., F.W.-B., L.D.W.-B.,

---

[1] We employ initials and pseudonyms to identify the parties, the children, and others to protect the children's privacy and because the records relating to Division proceedings held under Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

H.J.W.-B., L.S.W.-B., and K.A.M.,
minors.

_____

Argued October 28, 2025 – Decided November 13, 2025

Before Judges Gilson, Perez Friscia, and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FG-03-0007-24.

Ryan T. Clark, Designated Counsel, argued the cause for appellant K.W. (Jennifer N. Sellitti, Public Defender, attorney; Ryan T. Clark, on the briefs).

Deric Wu, Designated Counsel, argued the cause for appellant L.B. (Jennifer N. Sellitti, Public Defender, attorney; Deric Wu, on the briefs).

Lakshmi R. Barot, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Lakshmi R. Barot, on the brief).

Julie E. Goldstein, Assistant Deputy Public Defender, argued the cause for minors A.X.W., K.R.W.-B., F.W.-B., L.D.W.-B., H.J.W.-B., L.S.W.-B., and K.A.M. (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, of counsel and on the brief).

PER CURIAM

In these consolidated appeals, defendants K.W. (Kate) and L.B. (Levi) appeal from the June 26, 2024 judgment terminating their respective parental

2

rights to A.X.W. (Andy), K.A.M. (Kayla), K.R.W.-B. (Kelly), L.D.W.-B. (Luke), F.W.-B. (Faith), H.J.W.-B. (Hannah), and L.S.W.-B. (Leo) (collectively the children) and granting guardianship to the New Jersey Division of Child Protection and Permanency (Division) with a permanency plan for each child. Kate and Levi argue the trial court erroneously found the Division had proven by clear and convincing evidence prongs one and four of the best interests test and impermissibly relied on certain evidence to terminate their parental rights under N.J.S.A. 30:4C-15.1(a). The Division and the children's law guardian contends the court correctly found the Division had proven the best interests test to terminate Kate's and Levi's parental rights, and the judgment should be affirmed. Having reviewed the record, parties' arguments, and applicable law, we affirm the judgment because the court correctly applied the best interests of the child test, and substantial credible evidence supports its findings.

I.

We summarize the salient facts established during the four-day guardianship trial. The court terminated Kate's parental rights to Andy,[2] born in November 2009, and Kayla, born in February 2012, whose father is S.M. (Sam).[3]

---

[2] The Division was unable to identify Andy's biological father.

[3] Sam does not challenge the court's termination of his parental rights to Kayla.

The court also terminated Kate's and Levi's parental rights to their biological children: Kelly, born in August 2017; Luke, born in July 2018; Faith, born in August 2020; and twins Hannah and Leo, born in August 2022.[4]

During the trial, the Division presented the following witnesses: a Division permanency caseworker; a Division adoption caseworker; and Meryl E. Udell, Psy. D., a clinical and forensic psychologist. The law guardian's expert Michael Wiltsey, Psy. D., a clinical and forensic psychologist, also testified. Kate and Levi only appeared for the first day of trial and offered no witnesses or evidence.

The permanency caseworker testified that she became involved with the family in February 2023 following the children's 2022 removal and resource home placement. She was familiar with Kate's and Levi's Division records and histories. In November 2023, the Division transferred Kate and Levi's case to the adoption caseworker.

Prior to the 2022 referrals resulting in the children's removal, the Division had received separate referrals regarding Kate and Levi. A 1996 referral involving Levi was based on his treatment of a prior girlfriend's child. The

---

[4] Levi fathered two other children who are not parties to this appeal.

Division "substantiated"[5] Levi had committed abuse or neglect, determining he broke the child's femur.

The Division received its first referral involving Kate and Sam in February 2010, several months after Andy was born. There were concerns surrounding Kate's "ability to properly manage" Andy's medical conditions. Andy has: spastic quadriplegic cerebral palsy, requiring a wheelchair and "a pureed diet"; and cognitive impairments. In May 2015, after Kate gave birth to S.M. Jr. (Sammy),[6] the Division removed Andy, Kayla, and Sammy from Kate's care for approximately three weeks. The Division conducted the removal after learning Kate tested positive for cocaine, had a domestic violence history with Sam, and jeopardized Andy's and Kayla's welfare by permitting Sam in the home. In 2016,

---

[5] N.J.A.C. 3A:10-7.3(c) requires the Division to find that an "allegation is 'substantiated,' 'established,' 'not established,' or 'unfounded.'" An allegation is "substantiated" "if the preponderance of the evidence indicates that a child is . . . 'abused or neglected' . . . [under] N.J.S.A. 9:6-8.21 and either the investigation indicates the existence of any of the circumstances in N.J.A.C. 3A:10-7.4 or substantiation is warranted based on consideration of . . . [N.J.A.C. 3A:10-7.5's] aggravating and mitigating factors." N.J.A.C. 3A:10-7.3(c)(1). An allegation is "'established' if the preponderance of the evidence indicates that a child is . . . 'abused or neglected' as defined in N.J.S.A. 9:6-8.21, but the act or acts committed or omitted do not warrant a finding of 'substantiated' as defined in . . . [N.J.A.C. 3A:10-7.3(c)(1)]." N.J.A.C. 3A:10-7.3(c)(2).

[6] The record reflects Sammy lives with family friend C.D. (Cindy), and he is not a party to this appeal.

5

the Division substantiated Kate committed abuse or neglect after a referral that Sam and Kate "were selling drugs out of their vehicle" and "robbed at gunpoint" with Kayla and Sammy present. Based on safety concerns, the Division again removed the children. During the second removal, Andy was discovered with burns on his hands. Andy was placed at Matheny Hospital and Education Center (Matheny) and with resource parents on weekends. The Division placed Kayla and Sammy in a different resource home.

While the children were in the Division's care, Kate started dating Levi, and they had Kelly in 2017. Kelly was "also removed and placed" into the Division's custody. Between 2017 and 2018, the Division provided Kate and Levi services. In 2018, the Division returned Andy and Kayla "to [Kate's] care only." The Division also returned Kelly to Kate and Levi. Between 2018 and 2022, the Division received multiple referrals regarding Kate's and Levi's treatment of the children, which were deemed "unfounded" or "not established."

The adoption caseworker testified that in July 2022, the Division learned Kate and Levi attempted to shoplift food with the children present. At the time, they had been "living in their car," the children were unkept and dirty, and Andy was without his wheelchair. The Division secured the family two motel rooms

for a week.  Kate and Levi "chose to stay in the same room, leaving the children alone in the second room [on] a different floor."

The permanency caseworker testified that Kate gave birth to the twins, Hannah and Leo, on August 2 at the motel, and Kayla assisted with the delivery.  Kate received no prenatal care, and the twins were not medically examined.  Kate falsely indicated the twins "were her god sister's children."  When the Division learned of the births, Kate was instructed to immediately take the twins to a hospital, which she refused to do.  After the twins' birth, the motel manager evicted and banned the family because their room looked like a "murder scene," and employees discovered Kate's placenta in the bathtub.

On August 15, the Division received a police report that at about 5:00 a.m. the prior morning, a food store employee caught Kayla stealing food.  Kate and Levi were apparently unaware that Kayla, who cared for her siblings, crossed a four-lane highway barefoot and alone to steal food because her siblings were hungry.

On August 17, the Division removed the children due to concerns that Kate and Levi were:  "failing to provide basic needs to all of the children"; possibly using drugs; and not providing the children with sufficient medical care.  The Division noted:  the children wore dirty clothes; Andy, Luke, and

7

Faith had no shoes; and Andy had bruises and no working wheelchair. The twins were hospitalized and diagnosed with hypothermia, "low birthweight[s]," and dehydration, which were "life threatening." Andy was hospitalized for being malnourished and not having gained weight in three years. The other children were placed in non-relative resource homes.

The Division filed a complaint and order to show cause (OTSC) seeking care, custody, and supervision of the children, which the court granted on August 19. On September 8, the Division filed an amended complaint, adding "information regarding the children's medical conditions" and newly obtained police information from June 20 regarding Kate's motor vehicle violations arrest and Levi's narcotics offenses arrest. On December 9, the Division notified Kate and Levi it substantiated they committed abuse or neglect of the children based on: medical neglect; inadequate supervision; and their failure to provide basic needs. The court later held a fact-finding hearing, which Kate and Levi did not attend, and found pursuant to N.J.S.A. 9:6-8.21(c) that the Division substantiated Kate and Levi abused or neglected the children.

After Andy's release from the hospital, he was again placed at Matheny. The adoption caseworker testified that Kate and Levi repeatedly refused the Division's requests for authorizations to provide Andy with necessary medical

8

care. Luke and Faith were placed in a non-relative resource home together. After a medical evaluation, Luke was diagnosed with mental disorders and neurological conditions, including sensory processing disorder and autism spectrum disorder (ASD), which Kate and Levi failed to seek medical intervention for. The permanency caseworker confirmed that Luke was non-verbal. In June 2023, because of his behavioral issues, Luke was moved to a Community Treatment Solutions (CTS) home, a medical resource home. The permanency caseworker testified that sibling visits occurred "twice a month" while she worked with the family.

Kate and Levi inconsistently visited the children and maintained minimal contact with the Division. The Division learned Kate and Levi were arrested for shoplifting in September 2022. Kate and Levi failed to visit the children between December 2022 and January 2024 and had no communication with the children between January 2023 and January 2024. Additionally, on April 15, 2023, Levi was charged with criminal trespass and was found guilty in July of possession of prescription drugs without a prescription. About two months later, the Division discovered Levi was in jail. For the majority of time between August 2023 and June 2024, Kate and Levi were homeless.

The permanency caseworker explained Kate and Levi's failure to secure medical treatment for the children, especially Andy and Luke, was a serious concern.  For example, in April and August 2023, because Kate and Levi were unresponsive to the permanency caseworker's emails, text messages, and phone calls, the Division facilitated Luke's "NeurAbilities" evaluations.  As Kate and Levi were transient, they were often unlocatable.  Additionally, the permanency caseworker received no response to her attempts to communicate with Kate and Levi concerning Andy's required hip surgery.  Kate and Levi had attended one of Andy's virtual medical visits, but Kate became upset and uncooperative.  Regarding Andy, Kate and Levi failed to:  complete necessary paperwork; attend his March 2023 surgery; or visit.

The permanency caseworker observed that Kayla displayed "parentified behaviors," because Kayla had been required to attend to her siblings, which raised concerns for "her development as a normal child."  She witnessed Kate instruct Kayla to perform tasks for her siblings during a visit and relayed that Kayla also "exhibit[ed] clinging behavior" with caseworkers.

The permanency caseworker conveyed that because of Kate and Levi's refusal to cooperate, the Division had to seek court authorizations to cut Andy's and Luke's hair and obtain birth certificates for their children not born in a

A-3652-23

hospital. She believed: Kate and Levi failed to provide for the children's stability; it was not "safe to return [the children] to" Kate and Levi; the children were stable in their current placements; and the Division had continuing domestic violence concerns. With respect to Luke's potential future placement, the permanency caseworker explained that based on his medical needs, some placements would only become available once he was "legally freed" for select home adoption.

On October 19, 2023, the Division filed an OTSC and guardianship complaint seeking to terminate Kate's and Levi's parental rights. The court granted the OTSC on October 23 and thereafter terminated the Title Nine litigation on November 3.

The adoption caseworker testified that when she met with Kate, she explained that "to get their children back," Kate and Levi would need to complete court-ordered services, including "substance abuse evaluation[s], urine screen[s], psychological evaluations, and any recommendations." The adoption caseworker relayed that they did not complete the majority of the Division's offered services.

Regarding adoption or kinship legal guardianship (KLG), both caseworkers discussed the differences between the two permanency options with

Kayla, Kelly, Faith, and the twins' respective resource parents. Both caseworkers maintained the resource parents separately conveyed their commitment to adoption and understood the differences between adoption and KLG. Kelly, Faith, and the twins' resource parents expressed a desire to adopt the four children, because they wanted a "more permanent plan." All the resource parents had advised the adoption caseworker that "if the children were adopted," they would "agree[] to keep the siblings in contact."

The adoption caseworker testified that Andy's former resource parents visited him bi-weekly at Matheny and were also interested in adopting him. She understood that during Andy's prior removal, his former resource parents had "purchased a ranch style home" with a "wheelchair accessible ramp" to transition Andy into their care. Because his former resource parents were in their sixties, however, they "expressed some concerns about" adoption, fearing what would happen to Andy when they passed away. Andy's former resource parents advised the adoption caseworker that if they adopted him, they thought it best he remained at Matheny where he "receive[d] all his services and . . . education." The adoption caseworker recalled Kate had only visited Andy on two occasions at Matheny, and Kate and Levi failed to attend Andy's eighth grade graduation, even though the Division offered transportation. The adoption

caseworker confirmed that if Andy was not adopted, the Division would retain guardianship, and he would stay at Matheny even after he turned twenty-one, and the Division would no longer be involved in his care.

Regarding Luke, the adoption caseworker explained that Kate and Levi had failed to obtain interventional care for his neurological conditions. She recalled that they never communicated with the Division's nurse regarding Andy's and Luke's needs. She noted the children demonstrated their bond at visits, and occasionally, some of the children communicated telephonically. She confirmed Luke could remain in the CTS home indefinitely, and she did not believe Luke would be safe if returned to Kate and Levi's care.

The Division's expert Dr. Udell performed Kate's and Levi's psychological evaluations. After examining Kate, Dr. Udell determined Kate could not safely parent a child based on her "distorted perception of parenting" and lack of competent parenting skills. Dr. Udell based her opinion in part on Kate's failure to: ensure Andy, Luke, and the twins received medical care; appropriately homeschool the children; and provide the children stable housing, adequate supervision, and food. Dr. Udell opined Kate had "poor judgment" and "impaired" faculties, as demonstrated by Kate's failure to understand the gravity of the situation. Specifically, she testified that Kate did not accept that Luke

was non-verbal. Dr. Udell concluded Kate "believe[d] that she c[ould] take care of all of An[dy]'s medical and physical needs by herself."

She also opined that Kate failed to recognize that housing was not the only issue and there were "other problems." Further, Dr. Udell was concerned with Kate's diagnosed opiate disorder and failure to attend a recommended intensive outpatient treatment. Dr. Udell questioned Kate's sincerity after Kate advised she did not contact the Division to arrange visitation for over a year because "she could[ not] get on Wi-Fi anywhere[,] and she could[ not] find a place to charge her phone." She opined within "a reasonable degree of psychological certainty" that if the children were returned to Kate's care, they would suffer "serious and enduring harm." Accordingly, Dr. Udell concluded "it [wa]s not safe for the children to be returned to" Kate, and her parental rights should be terminated.

Regarding Levi's evaluation, Dr. Udell determined he lacked "the ability, the insight, [or] the judgment to safely and appropriately care for children." She concluded Levi did not understand Andy's conditions wrongly thought Luke did not have ASD and "just 'need[ed] a good talking to.'" Dr. Udell also noted Levi's "long history of mental illness," including "schizoaffective and bipolar disorder" and that he had been "arrested several times for possession [of a controlled

14

dangerous substance]."  She was concerned he could suffer from distorted thinking because he was also diagnosed "with an opioid use disorder," and his drug use exacerbated "the symptoms of bipolar [disorder]."  Further, Dr. Udell reported that Levi expressed no care or love for the children.  Dr. Udell opined within "a reasonable degree of psychological certainty" that "the children would not be safe with" Levi, they would suffer "serious and enduring harm" if returned, and Levi's parental rights should be terminated.

Dr. Udell opined that even together Kate and Levi could not effectively supervise the children.  She recognized Andy's and Luke's serious disabilities and that although their placement facilities provided for their educational and medical needs, the placements were not pre-adoptive homes.  Nevertheless, Dr. Udell believed the termination of Kate's and Levi's parental rights was appropriate.

Dr. Udell also completed bonding evaluations for Kayla, Kelly, Faith, the twins, and their respective resource parents.  She determined each child had developed a strong bond with their respective resource parents.  Further, she opined the children would suffer little harm from the termination of Kate's and Levi's parental rights and that any harm could be mitigated.  Within "a reasonable degree of psychological certainty," she opined that termination of

15

Kate's and Levi's parental rights and permitting the resource parents to adopt was appropriate.

The law guardian's expert Dr. Wiltsey testified that he tried to perform Kate's and Levi's psychological evaluations and bonding evaluations with their children. He could not conduct the evaluations because Kate and Levi failed to appear for their scheduled appointments.

After successfully completing a bonding evaluation of Kayla and her resource parents, Dr. Wiltsey determined a positive psychological bond existed, and her "resource parents [we]re committed to adoption." He had the "firm opinion that [Kayla] would experience emotional and psychological harm if she were suddenly removed" from her resource parents' care. He noted that Kayla: had only seen Kate and Levi a few times over a period of two years, wanted no visits with them, and wanted to change her last name. Further, Dr. Wiltsey opined that if Kayla suffered any harm from the termination of Kate's and Levi's parental rights, her resource parents would mitigate the harm. He believed the best plan for Kayla was to remain with her resource parents.

Dr. Wiltsey also performed a shortened bonding evaluation of Kelly, Faith, the twins, and their resource parents, due to the resource parents making an address mistake. He determined each child had bonded with their resource

16

parents and would be harmed if the bond was broken. He, however, believed the four children were at a "low risk" for harm if Kate's and Levi's parental rights were terminated. Dr. Wiltsey reported the best plan for the children was to remain with their resource parents and noted they were committed to adopting all four children. He also referred to the "regular and continual contact" the siblings had with each other and "highly recommended that sibling visitation continue."

On June 26, the court entered an order accompanied by a comprehensive, well-reasoned, fifty-page oral decision terminating Kate's and Levi's parental rights to the children. The court credited each witnesses' testimony after making specific observations and credibility findings. It determined the Division had satisfied its burden by clear and convincing evidence.

Under prong one, the court found that based on the evidence presented at trial, "there was harm for the children . . . caused by the[ir] relationship with" Kate and Levi. The court reasoned the Division had established prong two because Kate and Levi insufficiently "participated with the Division's . . . and court[-]ordered services" and failed to address their substance abuse, housing, and employment issues. In finding the Division satisfied prong three, the court determined the Division offered Kate and Levi significant services. Further, it

17

found no alternatives to terminating parental rights, noting the Division had investigated KLG, and the resource parents wished to adopt. As to Andy and Luke, the court specifically stated that "no appropriate alternative ha[d] been found other than termination of parental rights due to how potentially harmful being returned back to [Kate and Levi] . . . would be."

Regarding the Division satisfying its burden under prong four, the court reasoned that: Kayla and Kelly did not want to be returned to Kate and Levi; the children had received inadequate schooling in their care; Kayla, Kelly, Faith, and the twins were well cared for in their respective resource homes; Andy would face "severe harm" if returned to Kate and Levi; and Luke "should not be returned" to them "so that he could be adopted into a home that actually acknowledges his needs."

On appeal, Kate contends the court erred in: not finding that "terminating her parental rights would cause more harm than good under prong four of N.J.S.A. 30:4C-15.1(a)," because "termination without a single compensating benefit" to Andy and Luke "is contrary to public policy, judicial precedent, and [Division] standards," and "preserving sibling bonds is vital to the children's welfare and public policy"; relying "on poverty as a basis for terminating her parental rights, contrary to New Jersey law and public policy"; finding clear and

convincing evidence of "potential adoption . . . as a matter of law" because the resource parents "did not attend the proceedings[,] and the court failed to document their . . . absence as required on the form of judgment"; and relying "on Kate's failure to testify at trial[,] violat[ing] her constitutional rights." Levi joins Kate's first two arguments.

## II.

We review a trial court's decision to terminate parental rights with deference when its factual findings are "grounded in substantial and credible evidence in the record." N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" C.R. v. M.T., 257 N.J. 126, 139 (2024) (quoting MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007)). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). A "trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 116 (App. Div. 2021) (quoting In re

Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).  We owe no deference to a court's legal conclusions, which are reviewed de novo.  N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

"[P]arents have a constitutionally protected right to maintain a relationship with their children."  N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007).  That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent."  F.M., 211 N.J. at 447 (italicization omitted).  In guardianship and adoption cases, it is well-established that "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement."  N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 198-99 (2010) (quoting N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004)).  We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child."  C.S., 367 N.J. Super. at 111.  Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm.  See N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018).

When terminating parental rights, the trial court applies the statutory best interests test, which requires the Division to prove four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

The Division must prove each prong "by clear and convincing evidence." D.H., 469 N.J. Super. at 115. The prongs "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Child Prot. & Permanency v. D.A., 477 N.J. Super. 63, 83 (App. Div. 2023) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999)). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will

21

best be served by completely terminating the child's relationship with that parent." N.J. Div. of Child Prot. & Permanency v. D.C.A., 474 N.J. Super. 11, 26 (App. Div. 2022) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008)), aff'd, 256 N.J. 4 (2023). "[P]arental fitness is the key to determining the best interests of the child." I.S., 202 N.J. at 170 (quoting K.H.O., 161 N.J. at 348).

In 2021, the Legislature amended Title 30, which governs guardianship proceedings and contains the best interests test, and Title 3B, which concerns KLG proceedings. L. 2021, c. 154. The Legislature amended only prong two of the best interests test under N.J.S.A. 30:4C-15.1(a) by deleting the sentence: "[s]uch harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child." Compare L. 2021, c. 154, § 9 (current N.J.S.A. 30:4C-15.1(a)(2)), with L. 2015, c. 82, § 3 (prior version). The amendment did not preclude a court's consideration of a child's bond to a resource parent under prong four. The Supreme Court elucidated that "[t]he Legislature acted to preclude trial courts from considering harm resulting from the termination of a child's relationship with resource parents when they assess parental fitness under

the second prong, but not to generally bar such evidence from any aspect of the trial court's inquiry." D.C.A., 256 N.J. at 26 (citing L. 2021, c. 154).

## A. Prong One

We first address Kate and Levi's contention that the court erred in finding the Division met its burden under prong one by improperly relying on Kate and Levi's "poverty" and "homelessness." They similarly argue reversal is warranted because the court's termination of their parental rights was based on their economically disadvantaged status, "equating poverty with harm." Our review of the court's thorough opinion belies their contentions.

It is well-established that to satisfy prong one, the Division must demonstrate that the "child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1). "[T]he Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). "Although a particularly egregious single harm" can suffice, "the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. The court is not required to wait to intercede "until a child is actually irreparably impaired by

23

parental inattention or neglect." N.J. Div. of Child. Prot. & Permanency v. C.R.A.G., 479 N.J. Super. 504, 536 (App. Div. 2024) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)). Thus, it is sufficient to prove the risk or danger of harm. See N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001) (emphasizing that "[Title 30] speaks not merely of whether the child's safety, health or development has been endangered . . . , but rather, whether the child's safety, health or development will be endangered in the future").

In evaluating harm that threatens a child's health and well-being, the court's "primary focus . . . should be upon harm for which there is 'unambiguous and universal social condemnation.'" In re Guardianship of J.E.D., 217 N.J. Super. 1, 13 (App. Div. 1987) (citing N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 519, 604 (1986)). A "trial court should be careful not to decide a case because of a cultural bias or because of the parents economic or social circumstances." Id. at 12-13. Parents who are "not present to protect" their children from being raised in "a dangerous and destabilizing environment" create a risk of harm. F.M., 211 N.J. at 449. We have also recognized that "children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence." N.J. Div. of

Child Prot. & Permanency v. N.T., 445 N.J. Super. 13, 25 (App. Div. 2016) (quoting N.J.S.A. 2C:25-18). Further, a "parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." N.J. Div. of Child Prot. & Permanency v. P.D., 452 N.J. Super. 98, 119 (App. Div. 2017) (quoting D.M.H., 161 N.J. at 379); see also In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) ("Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights.").

The court properly found the Division credibly established Kate and Levi had failed to provide for the children's medical, educational, and safety needs. Its decision is replete with factual findings regarding the "harm facing [the] children," including that: the family was living in Kate and Levi's car prior to the children's removal; the children were involved in incidents of "stealing" food; Kayla was required to help Kate deliver the twins in the motel; Kayla was forced to care for her siblings; the twins required medical attention and had been "hypothermic and dehydrated"; Kate and Levi denied Luke's diagnoses and "need for special care"; the Division had removed Andy three times since his birth, and he was found without his wheelchair and "covered in bruises" after

25

the third removal; Kate had experienced domestic violence; Kate and Levi attended no visits with the children in 2023; there were valid substance abuse concerns regarding Kate and Levi; "the children's health, safety, and development ha[d] been and w[ould] continue to be harmed"; and Dr. Udell credibly opined that the children would be harmed if returned to their care.

The record supports the court's findings that Kate and Levi failed to provide the children with necessary "stability" and "safety." As the court noted, Kate and Levi "abandoned" the children through their extended failure to visit the children and participate in making required medical decisions for Andy and Luke, which they do not challenge. The court soundly reasoned that Kate and Levi wrongly believed the only issue they faced was lack of housing, while they failed to address their children's basic needs. The court did not, as Kate and Levi argue, rely "on poverty as a proxy for harm." It based its decision on Dr. Udell's opinion that Kate and Levi were unfit to parent the children and that it was unsafe to return the children to them.

The court provided sufficient findings under prong one regarding Kate's and Levi's harm to the children and that it was not "reasonably foreseeable" that they could "cease to inflict harm." Therefore, we discern no error in the court's well-reasoned prong one findings.

## B. Prong Four

We turn to address Kate and Levi's prong four arguments that the Division failed to show parental termination was in their children's "best interests" and "would promote the[ children's] welfare." While Kate and Levi argue the Division did not prove prong four by clear and convincing evidence for all the children, they primarily focus on Andy and Luke. Kate and Levi specifically contend that termination of their parental rights has no "compensating benefit" for Andy and Luke because their medical needs make adoption an unrealistic prospect.

Under prong four, termination of parental rights must "not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). Prong four "serves as a fail-safe against termination even where the remaining standards have been met." D.C.A., 256 N.J. at 23 (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007)). "Any analysis under the fourth prong must necessarily include a discussion of a child's prospects of permanency as terminating parental rights without any compensating benefit, such as adoption, may do great harm to a child." N.J. Div. of Youth & Fam. Servs. v. L.M., 430 N.J. Super. 428, 450 (App. Div. 2013).

The Division "should not simply extinguish an unsuccessful parent-child relationship without making provision for . . . a more promising relationship . . . [in] the child's future." N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 248 (App. Div. 2010) (alteration in original) (quoting E.P., 196 N.J. at 108). Consideration of a child's bond with his or her resource parents is permitted to ensure "the State's parens patriae obligation to protect the welfare of children." D.C.A., 256 N.J. at 27. It is "against a child's best interests to prolong permanent placement because the natural parent is unable to care for the child for a protracted period." N.J. Div. of Child Prot. & Permanency v. N.C.M., 438 N.J. Super. 356, 371 (App. Div. 2014). "Keeping the child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 484 (App. Div. 2012) (quoting A.G., 344 N.J. Super. at 438).

At the outset, we recognize the court was not required to find under prong four that there is a permanency plan for each child's adoption. Our Supreme Court has held that "there will be circumstances when the termination of parental rights must precede the permanency plan." A.W., 103 N.J. at 611. "A multiply-handicapped child or a young adolescent might not be adoptable at the time of the termination proceedings." Ibid. However, we recognize that "harm may

28

occur when a child is cycled through multiple foster homes after a parent's rights are severed." E.P., 196 N.J. at 109.

Here, the caseworkers testified that Andy and Luke could indefinitely remain at Matheny and the CTS home, respectively, where their medical and educational needs are met. Further, Andy would transition to Matheny's adult residency program upon turning eighteen, regardless of his former resource parents' adoption decision. After noting the substantial harm and danger Andy and Luke faced in Kate and Levi's care, particularly because of their medical needs, the court recognized that Andy and Luke would benefit from receiving consistent medical care in a familiar, stable placement. Kate and Levi failed to participate in Andy's and Luke's medical treatment for over two years, including Andy's necessary surgery and Luke's neurological testing. Also, while the children were in Kate and Levi's care, they were homeschooled without a plan, but Andy's and Luke's educational needs were addressed after removal.

The adoption caseworker acknowledged that Andy's former resource parents expressed concerns over adopting Andy, but they were still interested and visited Andy often. Further, while Luke was at a CTS home and could remain there indefinitely, he was eligible for "select home adoption." The adoption caseworker explained that some select home adoption opportunities

would only become available to Luke if Kate's and Levi's parental rights were terminated. The adoption caseworker believed the children, especially Andy and Luke, would be harmed if returned to Kate and Levi. Moreover, the court credited Dr. Udell's opinion that Kate and Levi were "not competent" to parent Andy and Luke, as neither could understand their disabilities. Thus, ample evidence in the record supports the court's determination that maintaining Kate's and Levi's parental rights to Andy and Luke would do more harm than good.

Regarding Kayla, Kelly, Faith, and the twins, the record also supports the court's findings that continuing Kate's and Levi's parental rights would do more harm than good. While the resource parents did not testify, the court accepted the caseworkers' testimony regarding the resource parents' knowing and informed desire to adopt. Further, the court credited both experts' testimony that Kayla, Kelly, Faith, and the twins had established bonds with their respective resource parents, and they would not suffer harm or would suffer minimal harm from the termination of Kate's and Levi's parental rights. The court found the children were cared for and in "loving homes."

Kate and Levi also argue that Andy and Luke have an insufficient compensating benefit because "there is little guarantee that the siblings will be able to see each other after termination of . . . [Kate's and Levi's parental] rights."

They contend that because sibling visitation rights "end upon the judicial termination of parental rights," termination creates a significant risk that the siblings' bonds will be severed.

Our Supreme Court has recognized that an adoptive family's "right to parental autonomy is not absolute," and visitation may be ordered "where it is necessary under the exercise of our parents patriae jurisdiction to avoid harm to the child." In re D.C., 203 N.J. 545, 551-52 (2010) (italicization omitted). It is clear that "siblings can petition for visitation with their brothers and sisters who have been adopted by non-relatives, subject to the avoidance of harm standard." Id. at 573; see also N.J.S.A. 9:2-7.1 (stating in pertinent part that "any sibling of a child residing in this State may make application . . . for an order for visitation. It shall be the burden of the applicant to prove by a preponderance of the evidence that the granting of visitation is in the best interests of the child").

In the present case, it is undisputed that the Division adhered to the sibling visitation policies established under the Child Placement Bill of Rights Act, N.J.S.A. 9:6B-1 to -6, and the Siblings' Bill of Rights, L. 2023, c. 1, §§ 1-3 (codified at N.J.S.A. 9:6B-2.1 to -2.2 and amending N.J.S.A. 9:6B-4). The record demonstrates the Division ensured sibling visitation and communication

regularly occurred.  See N.J.SA. 9:6B-4(u) (stating a child placed outside the home shall have the right "[t]o be actively involved in the lives of the child's siblings, including planning and attending celebrations, birthdays, holidays, graduations, and other meaningful milestones, to the greatest extent possible").

Additionally, the resource parents cooperated with frequent sibling visitation, and the adoption caseworker testified that the resource parents remained committed to maintaining the siblings' bonds and visitation, including with Andy at Matheny and Luke at the CTS home.  The court's termination of Kate's and Levi's parental rights does not extinguish the siblings' right to seek visitation.  A child can petition the court at any time for visitation with his or her siblings.  We are unpersuaded by Kate and Levi's speculative arguments that in the future, if the siblings' visitation is discontinued, there may be profound and irreversible harm.  Kate and Levi's ultimate contention that their parental rights must be preserved to promote the siblings' bonds is without merit.

We discern no error in the court's prong four findings and termination of Kate's and Levi's parental rights.  The Division has met its "heavy burden" by clear and convincing evidence of "show[ing] that termination of parental rights is in the best interests of the child[ren]."  E.P., 196 N.J. at 103.

## C. Failure of Resource Parents to Appear at Trial

Kate next contends the court erred in determining the Division established by "clear and convincing evidence" the resource parents' "potential adoption" because they were absent from the trial, and the court failed to document their absence on the form of judgment. She specifically argues that a 2021 AOC Directive[7] required the resource parents to receive notice and "attend all court proceedings, including [termination of parental rights] trials."

A plain reading of the Directive, however, shows that only a trial notice to resource parents is required and attendance at a termination proceeding is not mandated. Additionally, the court was not required to document the resource parents' attendance record. Contrary to Kate's argument, N.J.S.A. 30:4C-12.2 guarantees resource parents receive "notice" and have a "right to be heard," but clarifies that "the resource family parent or relative shall not be made a party to the review or hearing solely on" that basis. See also R. 5:12-4(i) ("The court shall ensure that the foster parent or other person currently providing residential care to the child is given notice of all hearings and other proceedings to be held

---

[7] Admin. Off. of the Cts., Admin. Directive #03-21, Family–Revised Children in Court Standards and Reissuance of Forms and the Appellate Division Protocol, at 2 (Jan. 21, 2021).

pursuant to L. 1999, c. 53."). Notably, Kate cites no authority to support her contention that resource parents are required to testify for the Division to meet its burden under the best interests test and for the court to terminate parental rights.

Further, Kate's contention that there was no clear and convincing evidence that the resource parents were unequivocally committed to adoption is contravened by the caseworkers' consistent testimony. During the bonding evaluations, Dr. Wiltsey also confirmed the resource parents were committed to adoption. Accordingly, sufficient credible evidence in the record supports the court's acceptance of the caseworkers' and Dr. Wiltsey's testimony regarding the resource parents' respective commitments to adopting Kayla, Kelly, Faith, and the twins.

### D. Kate's Failure to Attend the Trial

Kate's final argument is that the court erred in explicitly relying on her failure to testify as a basis for terminating her parental rights. She argues the court: "penalized" her for "exercising her constitutional right to remain silent"; "effectively shift[ed] the burden of proof" to her; and "dilute[d] the heightened procedural safeguards required in termination proceedings." Kate also contends

the court wrongly drew "an adverse inference" from "her absence at trial," citing the court's reference to her failure to testify or defend herself.

Relevant to our review of Kate's argument is the court's exact statement and the surrounding context. The court stated Kate and Levi "attended the first day of trial, but then never came to court again to testify or defend themselves from these accusations." The statement was made after the court provided its thorough factual findings regarding Kate's and Levi's harmful actions. Specifically, the court detailed the children's needs and determined Kate and Levi had failed to take "any meaningful steps to remediate the harm facing their children." The court noted Kate and Levi's failure to attend: visits with their children "for a whole year"; the scheduled bonding evaluations; court-ordered services; and the children's medical appointments. Relevantly, near the end of its detailed decision, the court found Kate and Levi had "shown no meaningful effort or ability to change" or "remediate the harm facing their children" and observed that they did not attend the majority of the trial, testify, or defend against the allegations. The court's decision never mentioned drawing an

adverse inference[8] against Kate under N.J.S.A. 30:4C-15.1(a) for not testifying nor shifting the burden of proof from the Division. After making detailed findings that the Division met its burden under the first two prongs of the best interests test, the court noted it had no reason to address any contrary evidence because Kate and Levi did not rebut the factual findings of harm.

We observe Kate had advised the court she could not attend the remaining trial dates due to her work schedule. Further, Kate attended the first trial day, was not called as a witness, and never advised the court she was invoking her right not to testify. Thus, we discern no support for Kate's argument that the court penalized her "for exercising her constitutional right to remain silent."

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

---

[8] "An adverse inference is '[a] detrimental conclusion drawn by the factfinder from a party's failure to produce evidence that is within the party's control.'" M.A. v. J.H.M., 260 N.J. 522, 534 (2025) (alternation in original) (quoting Black's Law Dictionary 927 (12th ed. 2024)).

A-3652-23